IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| PATRICIA Y. WEBSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 2:08-cv-849-MEF |
| | ) | |
| MICHAEL W. WYNNE, *et al.,* | ) | (WO-Do Not Publish) |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Patricia Webster ("Webster"), a civil employee of the United States Air Force ("USAF") brings this case alleging employment discrimination against the Department of the Air Force and Michael Wynne, as Secretary of the Department of the Air Force (collectively "Defendants"). This cause is before the Court on the Defendants' Motion for Summary Judgment (Doc. # 23). The Court has carefully reviewed the submissions in support of and in opposition to the motion. For the reasons set forth below, the Court finds that the motion is due to be GRANTED.

## JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). The parties do not contest personal jurisdiction and venue, and the Court finds adequate allegations in support of personal jurisdiction and venue.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## FACTUAL AND PROCEDURAL HISTORY

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion.  The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following relevant facts:

In 1999, Webster began working as a GS-1702-5 Education Technician at the Community College of the Air Force ("CCAF") in Montgomery, Alabama.  The CCAF is an institution that allows members of the USAF to obtain college degrees and to receive credit from courses take at private universities and colleges.  Webster is a Civil Service Retirement System ("CSRS") employee.

Webster originally worked in the Admissions Division where she entered transcript

3

information into CCAF records so students could be awarded credit for courses.  By late 2003, Webster felt that she could no longer work for her supervisor in the Admissions Division, Willie Mae Johnson.  Webster went to the Associate Registrar for CCAF, Teresa Amatuzzi ("Amatuzzi") to complain that she could no longer work for her supervisor.  At that time, CCAF was getting ready to implement a new system, the Singularity System, in the Registrar Division that would change the way transcripts were processed.  Knowing that Webster had good computer skills, Amatuzzi asked Webster if she would be interested in a new position working with the Singularity System in a different location under a different supervisor.  Webster expressed her interest in the new position.  Amatuzzi told Webster that the position would be to personnel, but that it would probably be a higher pay grade.  Webster also believed that it would be a different job classification than her current one.

When Webster began working with the Singularity System in the Registrar Division, her first direct supervisor was Tech Sergeant Suzanne Herbert ("Herbert").  In approximately February of 2005, Herbert left and Tech Sergeant Joel Derocher ("Derocher") became her direct supervisor.  Derocher was Webster's direct supervisor until 2006.  Webster's second level supervisor was initially Sergeant Milton Littlejohn ("Littlejohn") until October 2006 when Amatuzzi assumed responsibility for being her second level supervisor.

The CCAF Registrar submitted information to the 42nd Air Base Wing Civilian Personnel Office ("Civilian Personnel") regarding the new position in which Webster was working.  Civil Personnel made a final determination and issued a job description for the

4

position, called a Core Document.  The new Core Document classified the position as a GS-1702-05 Education Technician, but assigned it a duty title of Singularity Tech.  Webster complained that the Core Document for her position was inaccurate and submitted proposed changes.  CCAF passed Webster's proposed changes to Civilian Personnel, but Civilian Personnel rejected the proposed changes to a Core Document which it had so recently issued.  In December of 2005, the Commandant of the CCAF told Webster there was nothing more CCAF could do, but told Webster that she could file a personal appeal with Civilian Personnel.  She chose not to pursue such an appeal.

In February of 2006, Derocher sent an email out praising the efforts of Mranda Bivins ("Bivins"), one of Webster's African-American co-workers.  Derocher credited Bivins with reducing a backlog of transcripts.  Bivins showed the email to Webster.  Webster became upset because she felt that she, not Bivins, deserved credit for this work.  Webster called a meeting of the entire Registrar Division, including her direct and indirect supervisors and her peers.   At this meeting, she expressed that Bivins had not performed all the indexing that Derocher had given her credit for and that Webster had actually been the person who indexed more than half of the transcripts.  Thus, it was highly unusual for an employee of Webster's rank to convene such a meeting for the purpose of publicly complaining about an action taken by her direct supervisor, namely the email he sent giving Bivins credit.  Webster's actions upset Bivins.

On May 24, 2006, Derocher met with Webster and issued her 2005-2006 Annual

Appraisal.  Webster admits she received the highest possible rating on nearly all of the factors, but she complains that she was unfairly given a score of eight out of a possible nine on factor number four.  Although an eight means "Far Above Fully Successful," Webster believes she was due to be given a nine on factor four which evaluated her Working Relationships.  She concedes that Derocher included positive comments in the award justification section of her review.  Webster also admits that she received a performance award equal to 1.6% of her salary for this appraisal and twenty-four hours of annual leave, the same amount of paid leave which she had been given for previous awards arising out of performance appraisals.  Moreover, Webster admits that when Derocher gave her this performance evaluation he mentioned at least two reasons he felt this score was warranted.[1]

Webster believes she has heard from some unknown source that scoring all nines on a performance evaluation can help an employee become eligible for early retirement.  It is clear from her testimony on this point that Webster lacks personal knowledge concerning the facts underlying her belief.  The evidence before this Court from a person with actual knowledge on this subject is therefore undisputed.  Full retirement for CSRS employees, including Webster, is based on a combination of the employee's age and years of Federal service.  Retirement benefits are determined by years of Federal service and age of the

---

[1]  While Webster did not agree with Derocher's assessment of her performance, she admits he specifically referenced how she had upset Bivins and that he did not feel Webster respected members of management.  Moreover, it is undisputed that Webster had a history of scores lower than nine on this particular performance factor which predates her working under Derocher and her EEO actions.

employee when she retires.  Appraisal scores have no bearing on these calculations.

After receiving her May 2006 Appraisal, Webster sent Derocher an email asking him to change her evaluation and claiming that he had given her a score of only eight in Working Relationships because she had tried to change her Core Document.  Webster's email gave Derocher a less than forty-eight hour deadline for responding to her about whether he would be changing her evaluation.  Derocher responded that the rating was still in the "Superior" range and that it had nothing to do with her quest to raise her grade scale or change her Core Document.  Derocher indicated that he valued her work and knowledge but that the score was based on her actual working relations and that he could not in good conscience raise the rating.  Webster also approached Derocher's supervisor, Littlejohn, about the rating on her appraisal.  Littlejohn agreed with it and thought the overall Appraisal was excellent.

In June of 2006, Webster contacted an EEO counselor to complain that she was being retaliated against due to her attempt to change her Core Document.  The EEO Specialist to whom Webster complained went over the types of complaints that could be filed with the EEO and what kind of phrasing to use in the complaint.   After this, Webster filed a formal complaint with the EEO Specialist in which she alleged for the first time that Derocher, Littlejohn, and Amatuzzi discriminated against her on the basis of her race in giving her the score of eight instead of nine on the Working Relationships factor of her May 2006 Performance Appraisal.  In her deposition, Webster reiterated her belief that she received the rating due to her race and to her voicing her opinion about her Core Document because there

is, in her opinion, nothing to justify her having received that score otherwise.

On August 21, 2006, Derocher issued Webster an Initial Progress Review for the 2006-2007 appraisal period.  An Initial Progress Review does not contain ratings and is designed to set forth management expectations and ratings criteria for the year.  In the Cooperative/Responsiveness section, Derocher wrote that "Commander's calls and DRF calls are not optional, although any social functions that follow are.  Leave will not be granted for the sole purpose of missing such appointments.  I strongly urge you to support CCAF team members and especially those of DRF.  Attending social functions is a good way to build/maintain working relations and morale.  In the Organizational Skills section, Derocher wrote "Do not spend unnecessary time looking for future employment or researching personal issues.  You may conduct these ventures as long as it does not interfere with your primary duties."  In the Communication section, Derocher wrote "Keep myself informed of any unique circumstances, production problems, negative trends, and system problems..." Finally, in the Additional Items section, Derocher wrote that "There seems to be a trend with sick leave taken on Friday, Monday, or following/preceding a long weekend (mainly calling in the morning of.)  If this trend continues, you will be asked to provide doctor notes for any sick days past one business day.  Management will monitor your absences closely over the next three months.  If the trend continues, the new policy will be put into effect.  We understand you have medical issues; however, the timeliness is under question.

Webster has no idea what happens to an Initial Progress Review once it is placed in

her file.   She cannot point to any lost pay or benefits based on the Initial Progress Review. She admits that none of her supervisors relied upon it to take any action.  Nevertheless, on August 23, 2006, Webster amended her pending informal EEO complaint to add a claim that the August 21, 2006 Initial Progress Review was given to her in retaliation for her contacting an EEO Counselor in June of 2006.   On October 2, 2006, a statement verifying her two specific claims presented in her EEO complaint were that her Appraisal was due to her race and that comments in her Initial Progress Review were retaliation.  She also made a formal complaint presenting these claims.

In late 2006, the CCAF Vice Commander asked management to review functional processes within the CCAF to see if they could be made more efficient.  As part of the ensuing reorganization, Amatuzzi decided that Webster's position should be moved from the Registrar Division to the Admissions Division.  According to Amatuzzi, she believed that from a functional perspective, it made more sense to have Webster's position aligned with the Education Technicians in Admissions Division.  Additionally, she believed it made sense to move Webster's work station to the second floor where her new direct supervisor and the Education Technicians working in Admissions were located. On October 12, 2006, Webster was moved from her office downstairs to a new cubicle workstation upstairs.   Webster opposed the move.  She was not unhappy to be under Ford's supervision, but she did not see why she had to move to a cubicle on the second floor instead of staying in her first floor office.   After the move, she found her new work environment to be excessively noisy

9

although others in the area disagree with this assessment.

At the time of the move, Webster had three machines associated with her job duties: a template machine, a scanning machine, and a verification and testing machine.   Each machine needed an internet port.  Webster's assigned space on the second floor had only two internet ports.   Consequently, the template machine could not be moved to Webster's new work station until after a third internet port could be installed.   It took several months for that installation to be completed.   Webster did not use the template machine from the time her workstation was moved upstairs and the time when the template machine was moved upstairs after the third internet port was installed.  Webster admits that she did not use the template machine frequently.   However, Webster states that the move caused her stress in part due to the lack of ports and caused the quality of her work to suffer.

After Webster moved into Ford's section, she learned that the Education Technicians in the Admissions Division who were working for Ford in September of 2006, had been given an award of eight hours of time off.  Ford conceived of the idea of rewarding her subordinates for their hard work processing and graduating a record-breaking class.  She asked Amatuzzi, her direct supervisor, about the idea on September 15, 2006.  Amatuzzi approved the request.  Because Webster was not working for Ford in the Admissions Division or performing the work of Ford's employee during the time period for which the Admissions Division employees were being rewarded, Ford did not think it would be appropriate for her to give the time off award to Webster.  After learning about the award,

10

Webster asked Ford about it. Ford told Webster she would talk to Webster's prior supervisors. Derocher had not given any Registrar Division employee an award in relation to the October class even though many of them had worked hard on the class. When Ford asked Derocher whether Webster should receive the award that was being given to the Education Technicians in the Admissions Division for work they had completed prior to Webster's arrival, Derocher stated that he did not think so because Webster had not performed the same work that Ford's employees had performed in closing out the class and thus had not earned the award. He also stated that she had been absent during a critical time for the Registrar Division.[2]

Amatuzzi, Webster's new second-level supervisor, often went to room 201 to discuss work or other matters with Ford or other employees. Webster's new work station was located in room 201, along with the work stations of other employees. On October 31, 2006, Amatuzzi came into room 201 very loudly talking about how she had a counselor call about a foreign transcript but that she could not find the transcript because it was in a backlog. Webster does not believe that Amatuzzi had actually received a call from anyone about a transcript. Instead, she believes that Amatuzzi just made these public statements to belittle her and to suggest that she had not done her job.

On January 29, 2007, Webster filed a second formal EEO complaint. In that

---

[2] The busiest time for the Registrar Division's dealings with the October class was the end of August and in particular the last Friday of August. Webster was out sick on the last Friday in August.

complaint, she alleged that the failure to give her the time off award in November 2006, the change in her work station in October of 2006, and the actions of Amatuzzi on October 31, 2006, all constituted acts of retaliation by Derocher, Amatuzzi, and Littlejohn.

On August 15, 2007, Webster filed a third formal EEO complaint. This time she challenged a memorandum placed in her personnel file and an eight she received in Working Relationships in her 2007 Appraisal in May of 2007. She alleged that Amatuzzi took these actions against her to retaliate against her for her prior EEO complaints.

The Air Force consolidated Webster's first two formal EEO complaints. She received a letter notifying her of the consolidation and of an investigation on those complaints. The consolidated complaints were set for a hearing before an Administrative Law Judge ("AL"). The issues presented in the consolidated complaints heard by the ALJ were: (1) Webster's rating of a score lower than she earned on her 2006 Performance Appraisal constituted race discrimination; (2) failure to give Webster a time off award in November 2006 was retaliation; (3) Amatuzzi's statements in front of co-workers on October 31, 2006 constituted retaliation; (4) the October 12, 2006 move of her workstation to an inadequate location constituted retaliation; and (5) her August 21, 2006 Civilian Progress Review constituted retaliation.

On February 22, 2008, Webster and the Air Force entered into a negotiated agreement settling all possible claims Webster had as of that date except for those consolidated before the ALJ. Webster admits that she understood that by entering into that settlement agreement

she was waiving and releasing all her claims except for those consolidated for a hearing and listed above.

In March of 2008, the ALJ held a hearing on the consolidated claims.  The ALJ issued a decision finding no race discrimination and no retaliation.  On August 8, 2008, the Air Force adopted the ALJ's decision as its Final Agency Decision.  On October 24, 2008, Webster filed her Complaint in this Court.

In her Complaint (Doc. # 1), Webster sets forth claims pursuant to 42 U.S.C. § 2000e, *et seq.*  ("Title VII") and 42 U.S.C. § 1981.  Specifically, Webster invokes the provisions of these statutes which prohibit discrimination on the basis of race and retaliation for an exercise of protected conduct.[3]  Seeking declaratory relief, injunctive relief, and money damages, Webster complains about a variety of instances which she claims constitute either race discrimination or retaliation or both.   She complains about: (1) her skill code classification; (2) the change of her classification from Singularity Technician to Education Technician; (3) negative feedback from Derocher in June of 2006; (4) the relocation of her workstation; (5) her rating on appraisal factor 4 in her May 2006 Performance Appraisal; (6) a written and verbal reprimand from Amatuzzi in May of 2007; (7) the denial of a time-off award in November of 2007; (8) denial of training opportunities; (9) denial of TDY training

---

[3]   The introductory paragraph also mentions 42 U.S.C. § 12112, which prohibits discrimination against qualified individuals on the basis of disability.  The Court assumes that this citation was included in error as there are no facts alleged in the Complaint supporting such a claim and there have been no arguments or facts presented in conjunction to the summary judgment submissions with respect to such a claim.

assignments; and (10) a memo for record placed in her personnel file by Amatuzzi for not attending Commander Call.  Webster has not amended her Complaint since initiating this lawsuit.

## DISCUSSION

### A.  "Claims" of Sex Discrimination

Defendants contend that the claims for sex discrimination mentioned in Plaintiff's Memorandum in Response to Defendant's Motion for Summary Judgment (Doc. # 29) are not properly part of this lawsuit; the Court agrees.  The Federal Rules of Civil Procedure require that a pleading that states a claim for relief must contain a short plain statement showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8.  Recently, federal courts have recognized a tightening of the liberal pleadings standards such that a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face.  *See, e.g., Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) .  As the Supreme Court has explained "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. at 1949.  *Accord, Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009).  Moreover, if a plaintiff fails to plausibly allege a claim in her complaint, she may not amend her complaint through argument made in opposition to a defendant's motion for summary judgment.  *See Gilmour v. Gates,*

14

*McDonald & Co.,* 382 F.3d 1312, 1314 (11th Cir.2004) (per curiam) (liberal pleading standard does not allow plaintiff to raise a new claim at the summary judgment stage).

A careful review of the Complaint (Doc. # 1) reveals no hint that Webster alleges discrimination or harassment on the basis of her sex. It simply cannot be said that Webster has plead factual content to allow this Court to draw any reasonable inference that Defendants are liable for sex discrimination or sexual harassment. It is axiomatic that the omission of such claims from the Complaint, precludes Webster from pursing them in this lawsuit by assertions made in her brief in opposition to Defendants' motion for summary judgment. Thus, Defendants' motion for summary judgment is due to be GRANTED with respect to any claims for sex discrimination or sexual harassment.

**B. Claims Resolved by Negotiated Settlement**

Defendants contend that many of the claims presented in opposition to its motion for summary judgment are in fact claims extinguished by an earlier negotiated settlement between Webster and the USAF. Indeed, in her deposition, Webster admitted that the only claims she was pursuing in this lawsuit were: (1) a claim that she was discriminated against on the basis of her race when her supervisor gave her a lower than deserved elevation in March of 2006; (2) that she was retaliated against for prior EEO activity when she was not awarded time off in November of 2006; (3) that she was retaliated against for prior EEO activity when Amatuzzi belittled her in front of co-workers by indicating she was not

15

performing her duties;[4] (4) that she was retaliated against for prior EEO activity when her work station was moved to an inadequate location in October of 2006; and (5) that Derocher discriminated against her on account of her race and retaliated against her for prior EEO activity by giving her a negative Civil Progress Review in August of 2006.

Webster does not really acknowledge or respond to this contention in Defendant's Motion for Summary Judgment.  Instead, her brief, like her Complaint, is riddled with references to other claims and issues including claims and issues resolved by the negotiated settlement.   The Court finds as a matter of law that the settlement agreement Webster and her counsel negotiated with the USAF bars all of her claims other than those listed in the preceding paragraph.  *See, e.g., Johnson v.  Veneman*, 569 F.  Supp.  2d 148, 154 (D.D.C. 2008)*; Perryman v.  West*, 949 F.  Supp.  815, 822 (M.D. Ala.  1996).  To the extent that Defendants seek judgment as a matter of law on all claims other than specifically reserved by the settlement agreement as set forth elsewhere in this Memorandum Opinion and Order, the Court finds their petition is well taken and due to be GRANTED.   Accordingly, the claims set forth in paragraphs 13, 14, 18, 20, 21, and 22 of the Complaint are due to be DISMISSED because they have been settled.

**C.  Claim Regarding Amatuzzi Belittling Her on October 31, 2006**

Although it is clear from her deposition testimony that Webster believes that she is

---

[4]  While this complaint was included in the formal complaint heard by the ALJ, it is not alleged in any way in this Complaint which initiated this lawsuit.

pursuing a claim in this lawsuit arising out of Amatuzzi's allegedly belittling statements on October 31, 2006, the Court finds no factual predicate for such a claim included in the Complaint. The Court finds that Webster's failure to allege a factual predicate for this claim in her Complaint precludes her from litigating such a claim in this action. These facts cannot be a basis for a claim or recovery against the Defendants as they were never properly included in this suit. Thus, Defendants' motion for summary judgment is due to be GRANTED with respect to any claims relating to Amatuzzi Belittling Her on October 31, 2006.

**D. Claim Regarding Race Discrimination on May 2006 Annual Performance Appraisal**

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a). The critical element in establishing wrongful discrimination in violation of Title VII is discriminatory intent. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993).

Under Title VII, a plaintiff bears the ultimate burden of proving discriminatory treatment by a preponderance of the evidence. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Discriminatory intent can be established through a variety of means. *See, e.g., Davis v. Qualico Miscellaneous Inc.,* 161 F. Supp. 2d 1314, 1319 (M.D. Ala. 2001). Where, as here, a plaintiff seeks to prove intentional discrimination through

circumstantial evidence[5] of the employer's intent, the Court applies some version of the familiar tripartite burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and its progeny.

Under this framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *See, e.g., Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997), *cert. denied,* 522 U.S. 1045 (1998). The purpose of the *prima facie* case is to show an adverse employment decision that resulted from a discriminatory motive. *See, e.g., Perryman v. Johnson Prods. Co.,* 698 F.2d 1138, 1143 (11th Cir. 1983). Once a plaintiff establishes the requisite elements of the *prima facie* case, the defendant has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action. *See, e.g., Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir. 1997) (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981)). The employer's burden is "exceedingly light." *Holifield,* 115 F.3d at 1564. This burden is one of production, not persuasion and consequently, the employer need only produce evidence that could allow a rational fact-finder to conclude that the challenged employment action was not made for a discriminatory reason. *See, e.g., Davis,* 161 F. Supp. 2d at 1321.

If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *See, e.g., Holifield,* 115 F.3d at 1565;

---

[5]     Because Webster offers nothing which could conceivably be considered direct evidence or statistical evidence in support her discrimination claim, the Court will analyze this motion for summary judgment under the circumstantial evidence paradigm.

*Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997) (plaintiff "has the opportunity to discredit the defendant's proffered reasons for its decision").  Thus, once the employer articulates a legitimate, non-discriminatory reason, the burden returns to the employee to supply "evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Davis,* 161 F. Supp. 2d at 1322 (citing *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)).  The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Burdine,* 450 U.S. at 256; *Combs,* 106 F.3d at 1528.  A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000).

A plaintiff can establish a prima facie case by showing that: (1) she was a member of a protected class; (2) she was qualified to do the job; (3) she was subjected to an adverse employment action by her employer; and (4) similarly situated employees outside of the protected class were treated more favorably.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).  Nevertheless, the prima facie case formulation is flexible and often

dependent on the particular facts of a case.  *Id.*  Defendants contend that Webster fails to

establish a prima facie case in two ways: (a) she was not subjected to an adverse employment

action and (b) she has no evidence that similarly situated employees outside the protected

class were treated more favorably with respect to their Annual Performance Appraisal.

The Court finds that Webster has failed to offer sufficient admissible evidence from

which a reasonable jury could find that she has established a *prima facie* case with respect

to this claim.  Specifically, the Court finds no evidence that receiving a score of eight out of

nine on one factor of her Annual Performance Appraisal constituted an adverse employment

action[6] at the hands of her employer.  When the evidence is viewed in the light most

favorable to Webster, it simply does not constitute a event that, under the applicable law, is

actionable as a discrete act of discrimination.  Furthermore, Webster has not proffered any

evidence relating to comparators who she contends received more favorable treatment despite

---

[6]   In the Eleventh Circuit, an employee bringing a claim of discrimination must
establish an adverse employment action by showing that an "ultimate employment decision"
occurred or by making some other showing of substantiality.  *See, e.g., Crawford v. Carroll*,
529 F.3d 961, 970-71 (11th Cir. 2008).  An ultimate employment decision is one such as a
decision to terminate, demote, or refuse to hire.  *Id.*  Conduct falling short of an ultimate
employment decision must, in some substantial way alter the employee's compensation,
terms, conditions, or privileges of employment, deprive her of employment opportunity, or
adversely affect her status as an employee.  *Id.*  Such changes must be serious and material.
*Id.  Accord, Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209 (11th Cir. 2008); *Hulsey v. Pride
Restaurants, LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004); *Davis v. Town of Lake Park, Fla.*,
245 F.3d 1232 (11th Cir. 2001).  Importantly, the employee's subjective view of the
significance and adversity of the employer's action is not controlling and the employment
action must be materially adverse as viewed by a reasonable person in the circumstances.
*Butler*, 536 F.3d at 1215.

being sufficiently similarly situated to her to make them appropriate comparators under the applicable legal paradigm. For this reason, the Court find that the Defendants' Motion for Summary Judgment is due to be GRANTED with respect to this race discrimination claim and the claim is due to be DISMISSED.[7]

### E.  Claim Regarding Retaliation on August 2006 Progress Review

In addition to prohibiting race discrimination, Title VII also prohibits an employer from retaliating against an employee for reporting discrimination. 42 U.S.C. §§ 2000e3(a).[8] "Title VII's anti-retaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing." *Burlington Northern & Santa Fe R.Y. Co. v. White*, 548 U.S. 53, 59 (2006) (citing 42 U.S.C. § 2000e-3(a)). The term "discriminate against" has been found to refer to "distinctions or differences in treatment that injure protected individuals." *Id.* at 59-60 (collecting cases). Thus, to establish a *prima facie* case of retaliation forbidden by

---

[7]  Alternatively, the Court finds that Defendants are entitled to summary judgment on this claim because even assuming *arguendo* that Webster has established a prima facie case, she has utterly failed to offer evidence from which a reasonable fact-finder could decide that the Defendants' proffered legitimate, non-discriminatory reasons for the score of eight were pretextual or that the real reason was race discrimination.

[8]  42 U.S.C. § 2000e3(a) bars retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

21

Title VII, the plaintiff must normally show that: "(1) she participated in an activity protected by Title VII;[9] (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision." *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Cir. 2000) (setting forth *prima facie* elements).

Until 2006, the decisions of the Eleventh Circuit Court of Appeals addressing the degree of materiality required for an event or act to constitute an adverse employment action in the context of a retaliation claim required a similar degree of materiality as claims of discrimination. However, in 2006, the United States Supreme Court changed this standard when it concluded that Title VII's substantive provision and its anti-retaliation provision are not coterminous. *See Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. at 67. The Supreme Court has held that in order to sustain a Title VII retaliation claim, an employee must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. at 67-68 (internal citations and quotations omitted). Thus, the protection provided against retaliation is protection against employer actions that are likely to deter victims of discrimination from complaining to the EEOC, rather than petty slights, minor annoyances, or a lack of good manners. *Id.* at 68.

---

[9] Defendants in no way dispute that Webster's formal and informal complaints to the EEO counselor constitute conduct protected by the anti-retaliation provision of Title VII.

"To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta,* 212 F.3d at 590 (internal citation & alteration omitted). "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent. When evaluating a charge of employment discrimination, then, we must focus on the actual knowledge and actions of the decision-maker." *Walker v. Prudential Prop. & Cas. Ins. Co.,* 286 F.3d 1270, 1274 (11th Cir. 2002) (internal citations omitted).

Close temporal proximity between the protected conduct and the adverse action can constitute sufficient circumstantial evidence of causation in some, but not all, circumstances. *See, e.g., Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (citing affirmatively several court of appeals decisions for the proposition that a three to four month gap is insufficient to establish the causal relation prong in a retaliation case); *Wascura v. City of South Miami,* 257 F.3d 1238, 1244-45 (11th Cir. 2001) (While a close temporal proximity between two events may support a finding of a causal connection between those two events, the three and one-half month period between plaintiff's protected conduct and the adverse employment action challenged does not, standing alone, establish a causal connection); *Keel v. United States Dep't of Air Force,* 256 F. Supp. 2d 1269, 1291 (M.D. Ala. 2003) (more than seven month gap between protected conduct and allegedly retaliatory conduct was insufficient as a matter of law to establish the causation element of the *prima facie* case of retaliation). For the temporal proximity to suffice to establish the causal connection prong of the *prima facie* case, the employers' discovery of the protected conduct must immediately

23

precede the adverse action for the negative inference to attach. *Id.* More importantly for this case, "[i]n order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action." *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir. 1997).

In the case, Webster's protected activities were her informal complaints to the EEO counselor and her formal EEO complaints. For purposes of this action, all of Webster's protected activities occurred after June of 2006.[10] Given the temporal proximity between this protected conduct and the August 2006 Progress Review about which she complains, a reasonable factfinder might believe that the Progress Review was retaliatory if Webster had any evidence whatsoever that Derocher, the supervisor responsible for the Progress Review, had any knowledge of her protected conduct at the time he delivered the Progress Review. Unfortunately for Webster, the record is utterly devoid of any such evidence. It is her burden

---

[10] This was the date of Webster's first informal complaint to the EEO Counselor. To the extent that Webster appears at times to contend that her May 2006 Performance Appraisal score of eight out of nine on one factor was not only race discrimination, but also retaliation, her contentions fail to persuade. Although the evidence before the Court suggests that her supervisors knew of her efforts to change her Core Document, there is no evidence that suggests that these activities constitute the kind of conduct for which Title VII's anti-retaliation provision provides coverage. Additionally, the only claims relating to the May 2006 Performance Appraisal reserved to Webster by her settlement agreement was that it constituted race discrimination, not that it was retaliatory. For these reasons, the Court need not and will not discuss any events prior to the June 2006 Informal Complaint to the EEO counselor as possibly supporting a retaliation claim.

at this point to do so.[11]   Defendants have not moved for summary judgment on this ground. They elect instead to launch a barrage of other arguments aimed at other deficiencies in this claim.  Assuming *arguendo* that Derocher knew about Webster's informal complaint to the EEO counselor at the time he delivered the August 2006 Progress Review, a reasonable factfinder could find that the causal relation prong of the prima facie case was met.

Nevertheless, this claim fails because Webster has not shown that the August 2006 Progress Review, which suggested ways in which she could improve her performance and which was expressed in non-abusive terms, did not constitute a materially adverse action. *See, e.g., Hawkins v.  Potter*, 316 Fed.  Appx.  957, 962 (11th Cir.  2009); *Cole v.  Illinois*, 562 F.3d 812, 816-17 (7th Cir.  2008); *Baloch v.  Kempthorne*, 550 F.3d 1191, 1199 (D.C.  2008); *Ausby v.  Florida*, 624 F.  Supp.  2d 153, 1364-65 (M.D. Fla.  2008).  Absent evidence of this element, this retaliation claim fails.

In the alternative, the Court is satisfied that even if it were to assume *arguendo* that Webster had established a prima facie case of retaliation with respect to this claim, Defendants would still be entitled to summary judgment.   Defendants have offered a legitimate, non-retaliatory reason for the August 2006 Progress Review.  Webster has failed to offer sufficient evidence that the non-retaliatory reason is pretextual.  For this additional reason, Defendants' motion for summary judgment on this claim is due to be GRANTED.

---

[11]  The only mention in Webster's brief in opposition to summary judgment of anyone having knowledge of her EEO complaints is an assertion that Amatuzzi's deposition testimony establishes that "Defendants" had knowledge of the EEO activity.  This assertion fails to cite to the line and page of the deposition testimony to which Webster refers. Nevertheless, the Court read all lines and pages Webster submitted from Amatuzzi's deposition and found absolutely no support for Webster's assertion on this point.

**F.  Claim Regarding Retaliation Relating to November 2006 Time-Off Award Denial**

Defendants offer a variety of arguments in support of their motion for summary judgment with respect to Webster's claim that she was denied a time off reward in November of 2006.  The Court finds that no reasonable factfinder could find for Webster on this claim even if all the pertinent facts were found in her favor.  Webster has simply pointed to no evidence whatsoever which calls into question the legitimate non-retaliatory reason for Ford's decision not to award Webster a time-off award given to her other subordinates which those subordinates earned for work done prior to Webster's assignment to work in that division.

**G.  Claim Regarding Retaliation Relating to October 2006 Relocation of Workstation**

Defendants contend that they are entitled to summary judgment on this claim because Webster did not timely exhaust her claim regarding the decision to relocate her workstation to the second floor in October of 2006.  Title VII specifies the prerequisites that a plaintiff must satisfy before filing a private civil action brought pursuant to Title VII.  *See National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 109 (2002).  For example, federal employees must file an informal EEO complaint within forty-five days of any retaliatory discrete act in order to later challenge that act in a lawsuit.  *Shiver v.  Chertoff*, 549 F.3d 1342, 1344 (11th Cir.  2008); 29 C.F.R. § 1614.105(a)(1).

The central inquiry with respect to this claim then is whether Webster timely made an informal EEO complaint after learning of the relocation of her workstation.   It is undisputed that on October 10, 2006, Webster received an email notification, along with other affected employees and the union, that her workstation would be moved from room 109 to room

26

201.[12]  It is undisputed that Webster's workstation was moved on October 13, 2006, at the latest.[13]  It is also undisputed that Webster did not contact an EEO counselor regarding the change in her workstation until December 14, 2006.  It is clear on these facts that Webster failed to make a timely informal EEO complaint with respect to the relocation of her workstation.  Consequently, she may not pursue this claim in this action, and Defendants are entitled to judgment as a matter of law on it.

**H.  42 U.S.C. § 1981 Claims**

Defendants contend that this Court should dismiss Webster's claims pursuant to § 1981 because Title VII is the exclusive remedy for federal employees.  The Court agrees. *See Brown v. General Servs. Admin.*, 425 U.S. 820, 835 (1976).  Accordingly, Webster's claims pursuant to 42 U.S.C. § 1981 are due to be DISMISSED.

**I.  Claims Against the Department of the Air Force**

Defendants contend that all claims against the Department of the Air Force are due to be dismissed as it is not a proper party to this suit.   The Court agrees.  *See Canino v. United States Equal Emp't Opportunity Comm'n,* 707 F.2d 468, 469-72 (11th Cir. 1983). The head of the federal governmental agency involved in alleged employment discrimination is the only appropriate defendant in a Title VII action brought by a federal employee who alleges employment discrimination.  Accordingly, Webster's claims against the Department of the Air Force are due to be DISMISSED.

---

[12]  According to her deposition testimony, she first learned of the plan to move her workstation upstairs from Amatuzzi in August of 2006.

[13]  The paperwork indicates it would occur October 10 to October 13, but Webster remembers it occurring sometime earlier than that.

**CONCLUSION**

For the foregoing reasons, it is hereby ORDERED as follows:

1.  Defendants' Motion for Summary Judgment (Doc. # 23) is GRANTED.

2.  The trial and the pretrial are CANCELLED.

3.  A separate final judgment will be entered consistent with this Memorandum

Opinion and Order.

DONE this the 28th day of December, 2010.

                              /s/ Mark E. Fuller
                         CHIEF UNITED STATES DISTRICT JUDGE